**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RYAN FAUST,**

    **Plaintiff,**

**vs.**

    Civil Action 2:15-cv-3000

    Magistrate Judge Elizabeth P. Deavers

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**OPINION AND ORDER**

Plaintiff, Ryan Faust, brings this action under 42 U.S.C. §§ 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 20), and the administrative record (ECF No. 10). For the reasons that follow, the Commissioner's decision is **REVERSED** and this case is **REMANDED**.

    I.    **BACKGROUND**

Plaintiff filed his application for benefits on December 10, 2012, alleging that he has been disabled since April 4, 2011, due to chronic pain from fused vertebrae causing mobility depression; chronic back, neck and back of head pain; severe scoliosis; multiple fused vertebrae in his neck; arthritis; nerve damage; depression; and high blood pressure. (R. at 84.) Plaintiff's application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing

before an administrative law judge. Administrative Law Judge John Shailer (the "ALJ") held a hearing on June 17, 2014, at which Plaintiff, represented by counsel, appeared and testified. (R. at 34-75.) Physician and board certified orthopedic surgeon, Ronald Kendrick, M.D., appeared and testified at the hearing. (R. at 61-65.) Bruce Groieg, a vocational expert, also appeared and testified at the hearing. (R. at 65-74.) On July 11, 2014, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 16-28.) On October 6, 2015, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-3.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff testified at the administrative hearing that he attended about a year of college classes but never obtained a degree. (R. at 38.) He has not worked since his alleged onset date, in April 2011. (*Id*.) In the 15 years prior to the alleged onset, he worked for Adrian Typewriter Sales as an office supply deliveryman. (R. at 39.) He has also worked at the Y, as well as at Kroger. (R. at 39-40.) Finally, he worked at FedEx where he was loading and unloading trucks for roughly six months, driving a local delivery van for about a year and then working as a yard switcher. (R. at 40-41.) As a yard switcher, Plaintiff testified he drove trucks and backed the trailers up to the dock. (R. at 40.)

Plaintiff testified that he suffers from pain in his neck due to fusions. As a result, his neck mobility is limited when turning to the left and when looking up and moderately limited when turning to the right or looking down. (R. at 43-44.) Plaintiff mostly feels the pain in his

neck area but it can also radiate into his left shoulder.  It negatively affects his ability to reach overhead.  (R. at 44.)  Plaintiff further testified that he can pick up items weighing ten pounds but he would not be able to sustain the weight for up to two hours at a time.  (R. at 45.)  He also opined that he could likely sit or stand for up to 30 minutes at a time before the discomfort in his neck and back became prohibitive.  (R. 46.)  He can walk for up to half a mile at a time before needing to rest for about an hour.  (R. at 47-48.)

Plaintiff testified that his pain symptoms prevent him from maintaining regular employment.  For example, the ALJ questioned whether Plaintiff was able to perform requisite work on a conveyor belt assembly line, to which Plaintiff responded he would not last two hours doing so.  (R. at 49.)  Similarly, his work for FedEx became untenable because of the pain he experienced when turning his head while driving.  (R. at 50.)  With respect to loading and unloading, Plaintiff testified that it strained his back pain due to his scoliosis.  (R. at 51.)

Plaintiff stated that he is taking Tramadol, Advil and Hydrocodone for the pain.  (*Id*.)  He reported that the medications "[t]ake some of the edge off."  (R. at 47.)  In addition to the medication, Plaintiff ices and heats his neck to relieve the pain.  (R. at 56.)  He has also found some relief from the pain by reclining with a pillow under his neck two to three times throughout the day for a total of roughly thirty minutes.  (R. at 56-57.)

Plaintiff also testified that his depression negatively affects his ability to sustain employment.  (R. at 51-52.)  Plaintiff does not see a separate specialist in order to treat his depression.  (R. at 55.)

Plaintiff lives in a house with his wife and children.  (R. at 58.)  He is not able to perform household tasks such as mowing the lawn, shoveling snow, or other outside work, so his wife

does so.  (*Id.*)  Plaintiff testified that he is not able to run or pick up and carry his children.  (R. at 52.)  He also has trouble getting dressed or bending over due to stiffness in the morning.  After a few hours, however, the stiffness loosens to the point of being able to pick things up off the ground, though bending consistently causes some discomfort.  (R. at 53.)  He is, however, able to vacuum, cook and perform other household chores by breaking up tasks into increments so that he may utilize rest periods in between.  (R. at 57-58.)  Plaintiff also engages in an hour of stretching/inversion table therapy daily at home.  (R. at 59.)

Plaintiff further testified that, while his neck pain is constant, his lower back pain comes and goes.  A few times per year, he specified, he will have a bad back day during which he is "laid up for the day, but that's a rarity."  (R. at 60-61.)  Otherwise, the "normal ebbs and flows of the pain in [his] back is just uncomfortable," but he is able to "deal with it."  (R. at 61.)

**B.    Medical Expert Testimony**

Ronald Kendrick, M.D. (Dr. Kendrick), examined Plaintiff's medical record for physical impairments, and testified that Plaintiff has been diagnosed with Klippel-Feil syndrome, which is "a congenital fusion of a couple of cervical vertebrae, associated with a short neck, which he doesn't have and a low hairline, which he doesn't have."  (R. at 62.)  As a result, Dr. Kendrick, stated that he is "a little bit dubious about that diagnosis."  (*Id.*)  The record reflects Plaintiff has also had C3-C4 fusion in the past, as well as a degenerative disk disease in multiple areas of his cervical spine.  Additionally, he has had "congenital scoliosis in the dorsal spine extending from T3 to T11. . . ."  (R. at 62.)  Dr. Kendrick did not address any mental or psychological impairments.  (*Id.*)

Dr. Kendrick opined that Plaintiff's physical conditions do not meet the requisite definition of disabled. (R. at 62-63.) From the alleged onset date, Dr. Kendrick opined that Plaintiff's physical limitations would be pain-related, placing him in the light to sedentary work profile range. (R. at 63.) Specifically, Dr. Kendrick testified, Plaintiff was able to stand or walk for four out of eight hours, sit for six to eight, with restricted bending, stooping, kneeling and only occasional crawling or overhead reaching, but otherwise unrestricted use of his upper extremities. (*Id*.)

C.     **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff previously held the jobs of delivery driver, a semi-skilled and medium physically demanding position; material handler, a heavy and unskilled position; and courtesy driver, a light, semi-skilled position. (R. at 66.)

The ALJ proposed hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 67.) Based on Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ, the VE testified that a similarly-situated hypothetical individual could not perform Plaintiff's past work, but could perform sedentary, unskilled jobs in the national economy such as an office clerk, and work order clerk. (R. at 68-69.) The VE also testified if Plaintiff was required to take an hour-long break each day to engage in stretching and inversion therapy, he would not be able to engage in competitive employment. (R. at 69-70.) The VE testified that Plaintiff could not maintain competitive employment without accommodations, such as a sheltered workshop, if he was unable to maintain attention and concentration, to even a simple task for at least a two-hour segment. (R. at 71.)

When given a new hypothetical, the VE testified that a person who can lift and carry less than five pounds on a frequent basis, up to ten pounds occasionally, stand and/or walk for three to four hours out of an eight-hour workday, no more than 30 minutes at a time, sit for three to four hours per workday, no more than 30 minutes at a time, perform postural activities occasionally and lift frequently would not be able to perform work of a competitive nature due to specific restrictions on pushing and pulling.  (R. at 72-73.)

### III.  MEDICAL RECORDS

Plaintiff has a congenitally deformed spine, known as Kleppel-Feil syndrome, resulting in fusion of multiple cervical vertebrae, as well as congenital scoliosis in his dorsal spine extending from T3-T11, and multilevel degenerative disc disease of the cervical spine.  (R. at 240, 274, 351.)  In 2002, Plaintiff was diagnosed with mechanical low back pain, probably in association with the lower lumbar segment and a 55 degree congenital scoliosis.  (R. at 274.)  In April 2004, an MRI of Plaintiff's cervical spine showed congenital fusions of levels C4-5 and C6-7, as well as scoliosis of C6-7 and C7-1.  (R. at 272.)  An MRI of Plaintiff's lumbar spine showed narrowing at L2-3 and L4-5, with moderate facet arthopathy at L4-5 and L5-S1.  (*Id.*)

In November 2005, Plaintiff underwent an anterior discectomy, partial corpectomy and C3-4 fusion due to neck pain and symptoms.  (R. at 242.)  Subsequently, pieces of the hardware broke which required corrective surgery in May 2006.  (R. at 235.)  In 2010, Plaintiff was treated for increasing pain and occasional headaches.  (R. at 288.)  In March 2012, neurosurgeon Dr. Robert A. Dixon, D.O., evaluated Plaintiff due to increased frequency of neck pain and headaches, which were not responding to chiropractic adjustment.  Dr. Dixon concluded that Plaintiff's symptoms were "sufficiently severe . . . they are affecting his activities of daily

living." (R. at 247.) Dr. Dixon stated that Plaintiff's average daily neck pain was eight out of ten and observed that Plaintiff was taking daily medication. Upon examination, Dr. Dixon assessed neck pain localized to the cervicothoracic junction. He found anterolisthesis of C5 on C6, as well as a congenital block fusion of C6-7. In recommending further treatment, Dr. Dixon expressed concern that further fusion intervention would concentrate stress at the residual levels, particularly for a cervical occipital junction and C1-2 articulation. Due to the concern, Dr. Dixon recommended "additional conservative treatment measures to include medial branch blockade, in addition [*sic*] of cervical traction, and continued adjustment therapy." (*Id.*)

Dr. Dixon referred Plaintiff to Dr. Deborah Coates, who treated him in April 2012. Dr. Coates' evaluation stated that Plaintiff's 2006 surgery helped with headaches he was having but he told Dr. Coates that "it did not help very much with the neck pain. He did have a congenital block fusion at C4-C5 and at C6-C7." Plaintiff rated his pain at a five or six out of ten. Plaintiff was taking medications, including Cymbalta, gabapentin, omeprazole, lisinospril, as well as aspirin. (R. at 256.) Dr. Coates was not able to administer facet injections at that time due to the high dosage of aspirin Plaintiff had been taking. (R. at 257-58.) On May 2, 2012, he was able to undergo injections to his C4-5 and C6-7 levels. (R. at 267.) Plaintiff, however, reported on May 17, 2012 that the injections did not provide relief from his sharp and constant pain. (R. at 255.) In April and May, respectively, both Drs. Coates and Osborn recommended that Plaintiff titrate his Neurontin dose. (R. at 257, 278.) Dr. Osborn further recommended that Plaintiff consider Lidoderm patches. (R. at 278.)

In November 2012, Plaintiff's chiropractor, Chad D. Saathoff, D.C., noted that he experienced reduced range of motion in the cervical and lumbar spine with moderate pain. (R. at

7

304.)  He diagnosed Plaintiff with degenerative disc disease of the lumbar and cervical spines as well as scoliosis.  (*Id*.)  Plaintiff continued to receive chiropractic treatment form December 2012 through September 2013 for his neck and back pain and loss of motion.  (R. at 366, 380.)

In April 2013, Plaintiff had an initial visit to the Ohio State University Comprehensive Spine Center.  (R. at 391.)  He was diagnosed with Klippel-Feil syndrome as well as idiopathic scoliosis and kyphoscoliosis.  His pain score was reported at a seven.  (*Id*.)  Plaintiff was taking Lisinopril, sertraline, omeprazole, Aspirin, and Hydrocodone-Acetaminophen for his conditions.  (R. at 391-92.)  The treatments notes state that Plaintiff's worsening constant back pain is "limiting a lot of his daily activities."  (R. at 393.)  The cervical spine pain "radiates distally into the left arm."  While medications improve the pain, it becomes worse with activity.  "Overall, the pain is moderate and worsening."  (*Id*.)  The to-date treatments of rest, over the counter analgesics, prescription pain medications, opiods, physical therapy, and steroid injection had all been ineffective.  The treatment notes also indicate that scoliosis was detected in the lumbar spine, in addition to muscle spasm, and a limited range of motion without pain.  (R. at 395.)  The future treatment plan from the visit was to order additional diagnostics—full scoli films, cervical MRI and CT, cost permitting.  (R. at 395.)  The treatment notes state that Plaintiff would not benefit from physical therapy and should avoid chiropractic care "given the nature of his syndrome."  (*Id*.)  A few days after his visit, Plaintiff underwent X-ray examination of his cervical spine.  (R. at 398.)  The X-ray depicted "[s]ignificant levoscioliotic curvature of the upper thoracic spine on the AP image" in addition to "complete fusion at the posterior elements of C4 and C5 and partial fusion at the vertebral body level."  (R. at 399.)  The images also showed "slight fusion at the anterior aspect of C3/C4 level."  The X-ray additionally revealed

degenerative disc disease at C3/C4, and minimal restrolisthesis of C3 over C4.  (*Id*.)  Plaintiff visited the Spine Center again in May 2013 and the treatment notes once again indicated decreased range of motion and spinal spasms.  (R. at 404.)

From May 2013 through June 2013, Plaintiff continued to attend physical therapy until he was discharged and recommended to continue a home exercise program of stretching.  (R. at 415.)  He reported some improvement in functionality as a result of the physical therapy in addition to medications by March 2014.  (R. at 445-450.)  Yet, Plaintiff indicated to his chiropractor in April and May 2014 that he continued to have decreased range of motion in the cervical and lumbar spines with increased pain.  (R. at 442.)  Finally in May 2014, Dr. Osborne, Plaintiff's primary care physician, completed an assessment of physical limitations which stated that Plaintiff was limited to lifting no more than 10 pounds, had limited standing and sitting capacity, could only occasionally reach, and suffered from severe pain resulting in the need for hours of rest per day, in excess of what is typically allowed for in a work setting.  (R. at 455-56.)

## IV.  THE ADMINISTRATIVE DECISION

On November 10, 2014, the ALJ issued his decision.  (R. at 16-28.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.    Is the claimant engaged in substantial gainful activity?
    2.    Does the claimant suffer from one or more severe impairments?
    3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

gainful activity since April 4, 2011, the alleged onset date. (R. at 18.) The ALJ found that Plaintiff had the severe impairments of Klippel-Feil Syndrom, status post fusion at C3-4, degenerative disc disease at multiple levels in the cervical spine, and congenital scoliosis in the dorsal spine extending from T3-T11. (*Id.*) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.)

The ALJ found that the evidence of record "does not document sufficient objective medical evidence to substantiate the severity of the pain and symptoms and degree of functional limitations alleged by [Plaintiff]." (R. at 21.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the record, the undersigned finds that the claimant has the residual functional capacity to lift 15 pounds occasionally and 10 pounds frequently, stand or walk for a total of 4 hours in an 8-hour day, and sit for a total of 6 hours in an 8-hour day. He can occasionally bend, stoop, kneel, and crawl. He can only occasionally reach overhead, but otherwise has unrestricted use of his upper extremities.

(*Id.*)

The ALJ found that the Plaintiff's impairments "do not cause functional limitations that exceed" the aforementioned RFC. (R. at 22.) Specifically, in examining the evidence of record, the ALJ stated that Plaintiff "has done well with residual symptoms of neck pain since his fusion

---

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);

and his symptoms have responded well to chiropractic treatment on average twice per year until March 2012." (*Id*.) The ALJ highlighted that, while Plaintiff noticed increased frequency of neck pain and headaches at that time, "only further conservative treatment of medial branch blockage, cervical traction, and pain management was recommended" due to the fact that "diagnostic evidence showed the C2-3, C5-6, and C1-2 articulation to be relatively well-maintained, only mild anterolisthesis of C5 on C6, and well maintained disc height at C5-6." (*Id*.) Additionally, the ALJ noted, an examination in April 2012 "had a normal neurological exam and his extremities did not show any atrophy or decrease in strength." (*Id*.) Furthermore, an injection in October 2012 provided pain relief, and diagnostic testing completed in May 2013 "showed only *mild* degenerative changes of the spine." (*Id*.) (emphasis in original). Treatment notes from December 2013 also showed Plaintiff "had not been in the office for the past year and a subsequent progress note from March 20, 2014 indicated that he was doing very well on his medications." (*Id*.) Finally, Plaintiff was not taking narcotic pain medications and, therefore, "would not need to be restricted from exposure to dangerous machinery as argued by counsel." (*Id*.)

In reaching his determination, the ALJ gave "significant weight" to Dr. Kendrick's opinion due to the fact that it was "well supported by the medical evidence of record and is an accurate representation of the claimant's physical status." (*Id*.) The ALJ found that Dr. Kendrick's "assessment as to medical severity is more probative and reliable than the analysis from the State Agency reviewing sources." (*Id*.)

---

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ accepted the State Agency medical consultants' physical assessments "to the extent that they provide that the claimant is limited in overhead reaching with his upper extremities, which is consistent with the totality of the medical evidence of record." (R. at 23.) Less weight, however, was given to the remainder of their assessments "as the totality of the medical evidence of record, including the credible opinion of Dr. Kendrick, supports a finding that the claimant is somewhat more limited than assessed by the State Agency Consultants." (*Id.*)

The ALJ likewise gave less weight to the opinions of Dr. Osborn due to the fact that they were "inconsistent with the totality of the medical evidence of record including Dr. Osborn's own treatment notes." (*Id.*) Additionally, the ALJ gave less weight to the opinions of Plaintiff's chiropractor, Saathoff because the "extensive limitations including related to [Plaintiff's] ability to lift and carry, as well as sit, stand or walk for only 30 minutes at a time, are inconsistent with the totality of the medical evidence of record . . . the credible medicals opinions of Dr. Kendrick and the State Agency medical consultants, and the [Plaintiff's] presentation at the hearing as [he] was able to move his head in a limited range and was cheerful." (*Id.*) The ALJ also found that a chiropractor is not an "'acceptable medical source,' as defined in 20 CFR 404.1513 and therefore the opinion is, pursuant to 20 CFR 404.1527, not a 'medical opinion' and the opinion is considered only to the extent that it helps understand how an impairment affects the ability to work." (*Id.*)

Finally, the ALJ found that, in addition to a lack of objective evidence to support Plaintiff's subjective complaints, other considerations weighed against his overall credibility. For example, Plaintiff's daily activities were not restricted to the extent that he would be

12

precluded from employment. Specifically, Plaintiff was able to "provide care for his daughters including getting them ready for school, and he is able to make the bed, feed the dog, do chores 'a little at a time' , and go shopping." (R. at 23-24.) Moreover, while Plaintiff testified to "doing stretching, inversion table and exercising several times a day, as well as lying down 10 minutes at a time 2-3 times per day" the ALJ concluded that "there is no evidence in the record to support a finding that these stretching activities and breaks needs [*sic*] to be performed during the work day at unscheduled break times that would be able to be completed before or after the work day or during regularly scheduled breaks." (R. at 24.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff is not able to perform past relevant work, but can perform the requirements for 60-70% of all sedentary and unskilled jobs in the regional economy, amounting to about 45,000 jobs, including office clerk, and work order clerk. (R. at 26.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 27.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

*Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In his Statement of Errors, Plaintiff argues that: (1) the ALJ erred in failing to properly evaluate Plaintiff's pain and the effect of pain on Plaintiff's capacity to perform work; (2) the ALJ failed to consider the combined effect of all of Plaintiff's impairments in assessing the RFC; and (3) the ALJ failed to accord appropriate weight to the medical opinion of Dr. Saathof.

The Sixth Circuit has provided the following guidance in considering an ALJ's assessment of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.1994). The court has "explicitly noted, however, this test 'does not require objective evidence of the pain itself.'" *Id*. at 1039 (quoting *Duncan v. Sec. of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986)).

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs*., 823 F.2d 918, 920 (6th Cir.1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248; *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29,

15

2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

Here, there is no dispute that Plaintiff has an underlying medical condition within the requisite standard of *Felisky*. Thus, the Court's analysis will proceed directly to the second prong, which has two parts.

"It is important to note that these two parts are alternatives" and a "checklist of factors" is used in evaluating symptoms. *Id.* Specifically, the list of factors includes: (1) Plaintiff's daily activities; (2) the location duration, frequency, and intensity of the pain; (3) precipitating an aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain or other symptoms; (5) treatment, other than medication, received for relief of the pain; and (6) any measures used to relieve the pain. *Id.* at 1039-40; *accord* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii). "The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all the relevant evidence." *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). In addition to these factors, the court will also review the opinions and statements of the plaintiff's doctors. *Id.*

Here, the Court agrees with the Plaintiff's assertion that the ALJ's assessment did not reflect consideration of all of the relevant evidence in the record. First, the ALJ pointed to Plaintiff's March 2012 visit with Dr. Dixon and concluded that Plaintiff was recommended to pursue "only further conservative treatment of medial branch blockade, cervical traction, and pain management." (R. at 22.) The ALJ, however, failed to account for Dr. Dixon's express concern that further fusion intervention would cause further stress to Plaintiff's spine,

16

necessitating the recommendation for conservative treatment measures.  (R. at 247.)  Second, the ALJ noted that Plaintiff experienced improvement in his pain until 2012, but did not note the medical evidence documenting a decline in the years following.  (R. at 22.)  Third, the ALJ noted that the diagnostic testing completed in May 2013 showed only "*mild* degenerative changes of the spine."  (R. at 22) (emphasis in original).  Yet, the ALJ fails to note that the diagnostics depicted levoscioliotic curvature of the upper thoracic spine, complete and partial fusions in parts of the spine, degenerative disc disease and restrolisthesis.  (R. at 399.)  Finally, the ALJ considered treatment notes from December 2013 that stated Plaintiff "had not been in the office for treatment for the past year" with a subsequent progress note from March 2014 stated that he was doing well on his medications.  The ALJ further noted that Plaintiff was not taking any narcotic pain medications and, as such, would not be restricted from exposure to dangerous machinery in the workplace.  (R. at 22.)  Once again, the ALJ did not consider the rise in pain level and decrease in functionality that the medical record indicates Plaintiff suffered subsequent to December 2013.  (R. at 442, 455-56.)  The ALJ's opinion also did not reflect consideration of the notes in the medical record indicating that Plaintiff had tried prescription medications in the past but did not experience success in pain reduction on them.  Moreover, it was recommended that he did not continue with chiropractic treatment or physical therapy in April 2013.  (R. at 395.)

      The medical record reflects evidence pertinent to the list of requisite factors for the second-prong of the *Felisky* pain test that the ALJ's written opinion does not acknowledge.  For example, while the ALJ noted that Plaintiff had the ability to care for his daughters in the home, the ALJ failed to note that Plaintiff's wife must perform all the outside work.  Moreover, courts

have warned against crediting a claimant's ability to perform household chores as an indication of ability to engage in full-time employment. *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp. 3d 829, 838 (S.D. Ohio 2015) ("there is a significant difference between doing minimal self-sustaining household chores and performing work 40 hours a week for 52 weeks per year") (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007)). Here, the record evidence of Plaintiff's daily activities does not reflect an ability to perform full-time work. The ALJ's written opinion also does not reflect the replete evidence in the record of Plaintiff's frequency, intensity and duration of pain. Since his surgeries in 2005 and 2006, Plaintiff was treated for severe neck and back pain in April 2012 (R. at 256), May 2012 (R. at 267), November 2012 (R. at 304), April 2013 (R. at 391), May 2013 (R. at 404), April 2014 (R. at 442), and May 2014 (R. at 455). Finally, the ALJ noted Plaintiff was not taking any prescription medications and had temporal gaps in his treatment, but the ALJ did not point to the record evidence that Plaintiff had attempted several methods of treatment—over the counter medications, analgesics, pain relievers, opiates, physical therapy, steroid injection and chiropractic treatment, all of which had failed. (R. at 395.)

Under these circumstances and upon a review of the medical record as a whole, the Court finds the ALJ erred in failing to consider the totality of the evidence. *See Rothgeb v. Astrue*, 626 F. Supp. 2d 797, 808 (S.D. Ohio 2009) (ALJ erred in failing to consider entirety of treatment notes); *Hopkins v. Comm'r of Soc. Sec.*, No. 1:07-CV-964, 2009 WL 1360222, at *14 (S.D. Ohio May 14, 2009) ("The ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."). Despite the deference due to the ALJ's assessment of Plaintiff's credibility, the Court concludes that the determination is not supported

by substantial evidence and is not based on consideration of the entire record. *Waters*, 127 F.3d at 531; *Rogers*, 486 F.3d at 247.[2]

## VII. CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Commissioner of Social Security's non-disability finding is **REVERSED** and this case is **REMANDED** to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Opinion.

**IT IS SO ORDERED**.

Date: March 27, 2017    /s/ *Elizabeth A. Preston Deavers*
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE

---

[2] This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error. Thus, the Court need not, and does not, resolve the alternative bases Plaintiff asserts support reversal and remand.